UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| KINSLEY GROUP, INC., *et al.*,<br>    *Plaintiffs*,<br>    *v.*<br>MWM ENERGY SYSTEMS, *et al.*,<br>    *Defendants*. | Civil No. 3:12cv1286 (JBA)<br><br>September 23, 2014 |

Defendants MWM of America, Inc. ("MWM USA") and MWM GmbH ("MWM Germany") (collectively "MWM") move [Doc. # 62] for judgment on the pleadings on the Amended Complaint [Doc. # 43] filed by Plaintiffs Kinsley Group, Inc. ("Kinsley Group") and Kinsley Energy Systems, LLC ("KES") (collectively "Kinsley") alleging a violation of the Connecticut Franchise Act ("CFA"), Conn. Gen. Stat. § 42-133e., *et seq.*

On April 22, 2013 and May 8, 2013, the Court held oral argument on Defendants' Motion [Doc. # 47] to Dismiss the Amended Complaint and concluded that an evidentiary record was required to make the fact-intensive determination of whether Plaintiffs were franchisees under the CFA.  Defendants' Motion to Dismiss was denied [Doc. # 55] without prejudice to be refiled as a motion for judgment on the pleadings to be adjudicated under a summary judgment standard after the completion of discovery limited to the issue of whether Plaintiffs met the statutory definition of franchisees.[1]  As discussed below, the evidentiary record offered by Plaintiffs does not show that they could be franchisees, and thus Defendants' motion is granted.

---

[1] Whether Defendants had the requisite "good cause" to terminate a franchise relationship is not at issue in this motion.

I.      **Background**

Kinsley Group is a family owned and operated company based in Connecticut whose business includes selling, servicing and renting power generation equipment through its subsidiary Kinsley Power Systems ("Kinsley Power").  (Kinsley Dep., Ex. 1 to Pls.' Loc. R. 56(a)2 Stmt. [Doc. # 65] at 11–12, 25.)  Defendant MWM Germany is a German corporation that manufactures power generators under the "MWM" brand.  Its predecessor company marketed power generators as the "Deutz" brand, which, according to Kinsley, was perceived to have quality issues. (*Id.* at 145.)

After changing brand names, MWM Germany sought to enter the United States market through a distribution agreement with Kinsley.  MWM relied on Kinsley to increase MWM's sale of generators in the Northeast, because Kinsley, unlike MWM, had experience in the region.  (Vodermayer Dep., Ex. J to Defs.' Loc. R. 56(a)1 Stmt. [Doc. # 62-1] at 115–16.)  David Kinsley, the President of the Kinsley entities, took a long-term approach to marketing because there was "missionary work that need[ed] to take place to overcome a . . . debilitated brand because of past issues with MWM in the marketplace." (Kinsley Dep. at 145.)

On June 1, 2010, MWM Germany and Kinsley Power entered into the Distribution Agreement ("Distribution Agreement," Ex. B to Defs.' 56(a)1 at 1).  Under the Distribution Agreement, Kinsley was given the exclusive rights to market, sell, install and provide repair and maintenance services for power generators manufactured by MWM Germany in the Northeast and Mid-Atlantic regions of the United States.  (*Id.* at 2.)  Kinsley was prohibited from promoting, marketing, selling, purchasing or distributing any products in these regions that potentially competed with Defendants'

products while the Distribution Agreement was in effect and for twelve months thereafter except the parties explicitly agreed that Kinsley could continue to market and distribute products for Kohler, the largest source of its business, whose products did not compete with MWM.  (*Id.* ¶ 19; Kinsley Dep. at 84, 47–50; Schwab Dep., Ex. E to Defs.' 56(a)1 at 54.)

MWM Germany designated MWM USA as its "agreement manager" to provide sales and service support for MWM Germany's distributors in the United States and delegated to it certain administrative functions, such as processing orders for MWM services; providing distributors with existing MWM marketing materials as requested by distributors; answering technical questions of distributors; providing notices of changes to MWM products; and training distributors in the operation or maintenance of MWM products.  (Distribution Agreement at ¶ 5; Schwab Dep. at 24).

The Distribution Agreement between Kinsley and MWM stated:

> The parties further agree that [the Distribution] Agreement will not constitute a franchise agreement under Georgia or any other law.  If the parties' relationship is deemed to be a franchise by a court or other judicial body, the parties hereto expressly agree to waive all rights and remedies which either of them may have due to any status as a franchisor or franchisee or in accordance with any franchise law, rules, or regulations.

(Distribution Agreement ¶ 4.)

Mr. Kinsley was represented by counsel in these negotiations with MWM and although he acknowledged that "[t]here was a lot of negotiations back and forth" and that MWM agreed to change some of the terms and conditions of the Distribution Agreement, he never asked MWM to change the language of this provision to reflect that there was a franchise relationship between the parties.  (Kinsley Dept. at 32–36, 43–45; *see*

3

*also* April 30, 2010 email, Pedro-Gil Vodermayer to David Kinsley, Ex. G to Defs.' 56(a)1 (outlining MWM's response to a number of changes to the Distribution Agreement proposed by Mr. Kinsley).)

An Integration Clause provided:

The [Distribution] Agreement constitutes the entire Agreement of the parties with regard to the Products and matters addressed therein.  All letter, proposals, discussions, and other documents regarding the Products and the matters addressed in the Agreement are superseded by and merged into the [Distribution] Agreement.

(*Id.* ¶ 28(j).)

In September 2010, after Kinsley Power and MWM Germany entered into the Distribution Agreement, Kinsley created KES as a separate entity with responsibility for sales and support of MWM products.  Mr. Kinsley served as the President of both entities; however, when he signed the Distribution Agreement he did so in his capacity as President of Kinsley Power, and not of KES.  The Distribution Agreement provided that Kinsley Power could not assign the Agreement or any of its rights, interests, or obligations under the agreement "without the prior written approval of MWM, which approval will not be unreasonably withheld."  (Distribution Agreement ¶ 28.)  Mr. Kinsley told MWM in July 2010 that he was in the process of forming KES as a new legal entity, and in November 2010, he sent MWM a draft assignment and assumption agreement to assign the Distribution Agreement from Kinsley Power to KES. (Vodermayer Dep. at 273.)  MWM proposed revisions to the agreement, however, the parties never came to an agreement on the assignment.  (*Id.* at 287; Kinsley Dep. at 96–97.)

### A.      The Parties' Relationship Under the Distribution Agreement

The Distribution Agreement provided that Defendants "shall not dictate or control the prices at which the Products are sold by [Kinsley] to [its] customers" (Distribution Agreement ¶ 6) and MWM did not set the retail prices that Kinsley charged its customers for MWM products or its services; Kinsley negotiated such prices with its customers directly (Kinsley's and KES's Resps. to Defs.' Reqs. for Admiss Nos. 1–2; Kinsley Dep. at 191).  However, MWM unilaterally set the wholesale price at which it sold products to Kinsley and would not negotiate with Kinsley on this price.  (Kinsley Dep. at 190–91.)

The Distribution Agreement granted Kinsley a license to use MWM's trademarks and Kinsley created a "special dedicated KES home page" on its website for KES's support of MWM products.  (July 25 email Vodermayer to Budak, *et al.*, Ex. 13 to Pls.' 56(a)2.) Plaintiffs appeared at trade shows with booths displaying the MWM trademark.  (Schwab Dep. at 176, 68; Vodermayer Dep. at 76.)  Although Kinsley printed business cards for distribution to potential customers with the MWM logo on the back, used the MWM logo in presentations to potential customers, and displayed the logo on posters and banners in its primary office in Connecticut (Schwab Dep. at 70, 83, 104–105; Vodermayer Dep. at 73–74; Business Card Image, Ex. Q to Defs.' 56(a)1), MWM did not dictate the format of the business cards and did not require or instruct Kinsley to create marketing brochures (Kinsley Dep. at 167–68, 160–61).  Kinsley never placed the MWM mark on the outside of its buildings and while its service vehicles displayed the Kinsley and Kohler marks, none had the MWM mark.  (Kinsley Dep. at 97, 99, 100, 254–56, 101; *see also* Photograph of Kinsley Vehicle, Ex. M to Defs.' 56(a)1.)

The agreement provided that Kinsley was required to "[e]mploy commercial and technical staff for administration and field duties" and "that the number and professional qualifications shall be adequate to handle business operations." (Distribution Agreement ¶ 3.1(b).)  MWM provided training to Kinsley on how to service its engines, however, they jointly agreed on the range of training required.  (Kinsley Dep. at 107–08; Vodermayer Dep. at 177–78.)  MWM offered Kinsley four weeks of sales training, but Kinsley decided to have only two weeks of training.  (Vodermayer Dep. at 254–55.) Kinsley and MWM discussed what an acceptable number of trained sales staff would be, and agreed upon a plan setting forth this number.  (Kinsley Dep. at 56–58.)

MWM did not audit Kinsley's financial records during the Distribution Agreement.  (Kinsley's and KES's Resps. to Defs.' Reqs. for Admiss. No. 13, Exs. D & W to Defs.' 56(a)1.)  MWM did not dictate the days or hours that Kinsley sold MWM products, did not require Kinsley employees to wear uniforms, or ask it to alter the design of its work space or service facilities.  (*Id.* Nos. 5, 8; Kinsley Dep. at 67–68.)

The Distribution Agreement required Kinsley to provide MWM with an annual business plan which it relied on to determine projected sales and its production requirements.  (Distribution Agreement ¶ 13; Schwab Dep. at 126–27.)  Although MWM provided a model business plan for its distributors, Kinsley was not required to use this model and instead used a different model adapted from a business book that Mr. Kinsley had read.  (Kinsley Dep. at 195–97, 211–13).  After Kinsley submitted its plan, it would discuss it with MWM, which would have to approve it, but if they could not come to an agreement on a sales target, MWM "acting in good faith" could unilaterally set one.  (*Id.* at 194–95; Schwab Dep. at 134–35.)  Kinsley set its sales targets and Mr. Kinsley did not

recall MWM asking him to make changes to plans submitted for fiscal years 2011 and 2012, however, MWM conveyed to Kinsley its general expectations for sales.  (Schwab Dep. at 218–19; Kinsley Dep. at 220–27.)

Mr. Kinsley testified that from July 1, 2011 through June 30, 2012, KES generated only a "small" amount of revenue, all of which came from MWM, but he could not recall the specific figure (Kinsley Dep. at 14–15) and Plaintiffs did not produce in discovery any evidence showing that KES had any orders, sales or revenues of MWM products during the Agreement.[2]  From 2010 to 2012, less than 10 percent of Kinsley Power's revenue and business was derived from its association with MWM while over 50 percent of its business was derived from its association with Kohler.  (Pls.' Responses to Defs.' Reqs. for Admiss., Nos. 22, 25, 28, 31, 32, 36, 40, 44.)  In 2010, 2011, and 2012, Kinsley Power's revenue was greater than $1 million per year, and throughout the lifetime of the

---

[2] In its opposition brief, Plaintiffs submitted for the first time an invoice and affidavit showing that on September 22, 2011, MWM paid KES a commission of $60,000 for introducing Defendants to two customers in December 2009.  (Ex. A to Kinsley Aff. [Doc. #67].)  Defendants object to the Court considering this document, because it was not produced during discovery for use during depositions under the procedure devised by the Court and the parties to develop an evidentiary record while conducting only limited discovery.  (May 8, 2013 Tr. [Doc. #58] at 18; Defs.' Reply at 5 n.5.)  These December 2009 sales have little bearing on Plaintiffs' claim of a franchise relationship given that the sales occurred before the execution of the Distribution Agreement and before KES was formed (the commission was paid in September 2011 to KES, which had been formed by that point).  Additionally, MWM, not Kinsley Power, sold the equipment and Kinsley Power received a 2.5% finders' fee rather than the proceeds of the sale.  (Defs.' Reply 56(a)1 [Doc. #70-2] ¶¶ 130–38.)  Given the nature of the payment, its relatively small size, and its occurrence before the Distribution Agreement was executed, the belated introduction of the commission payment is not relevant to the question of whether Plaintiffs were franchisees.  *See Getty Petroleum Marketing, Inc. v. Ahmad*, 253 Conn. 806, 818–19 (2000) (no franchise relationship based on sale by commission agent who did not assume "market risk" associated with the defendant's product).

Distribution Agreement, Kinsley Power generated about $200,000 total in MWM revenue.  (Schwab Dep. at 242.)

In November 2010, Defendants were acquired by Caterpillar, which has its own distribution network in the United States, and Plaintiffs contend that as a result of this acquisition, "Defendants began to find alleged fault with Kinsley's performance in the sales of MWM generators" (Am. Compl. ¶ 18) and terminated the Distribution Agreement in February 2012.

## II.   Discussion[3]

### A.  Franchise Relationship Under the CFA

The CFA defines a "franchise" as:

> an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, . . . and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name,

---

[3] The parties have agreed that Defendants' Motion for Judgment on the Pleadings will be analyzed under a summary judgment standard in which judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

> logotype, advertising or other commercial symbol designating the franchisor or its affiliate, and includes any agreement between a manufacturer, refiner or producer and a distributor, wholesaler or jobber, between a manufacturer, refiner or producer and a retailer, or between a distributor, wholesaler or jobber and a retailer.

Conn. Gen. Stat. § 42-133e(b).

The CFA "was enacted in order to try to equalize the distribution of power between franchisees and franchisors." *Hartford Elec. Supply Co. v. Allen-Bradley Co., Inc.*, 250 Conn. 334, 345 (1999). In considering the legislation, some legislators "believed that large oil companies were taking advantage of local gasoline station dealers," however, the CFA was enacted "in a form broad enough to cover virtually every type of franchise." *Id.* "The record of the debate on the bill that became the CFA shows that the bill's supporters wanted to protect individuals—particularly unsophisticated individuals—whose economic survival depends on a franchise relationship." *Rudel Mach. Co., Inc. v. Giddings & Lewis, Inc.*, 68 F. Supp. 2d 118, 126 (D. Conn. 1999).

The bill's sponsor explained:

> [O]ur committee has heard testimony from many franchisees who have literally sunk their life savings into their businesses and then have seen their investments and their labors go down the drain . . . . [W]e believed that limits must be set on the too often arbitrary and freewheeling operations of some of the giant franchising companies. We believe our State must assume a minimum level of protection to the small business man from a corporation which suddenly and capriciously snatches away his livelihood.

*Id.* (quoting H.R. Proc., 1972 Sess., p. 2777 (Statement of Rep. Webber) (alterations in original)).

"The franchise act's remedial purpose, to prevent a franchisor from unfairly exerting economic leverage over a franchisee, indicates that the statute should be read broadly in favor of the plaintiff." *Hartford Elec. Supply Co.*, 250 Conn. at 345.

In order to establish that that it is a franchisee under the CFA, Kinsley must show (1) there was an oral or written franchise agreement; (2) Kinsley was "substantially associated" with MWM; and (3) MWM "substantially prescribed" Kinsley's business.

### A.    Agreement

The "broad language" of § 42–133e (b), referring to "an oral or written agreement or arrangement," establishes that the "relationship of the parties . . . is not governed solely by the parties' main written agreement," but rather "by reality." *Hartford Elec. Supply Co.,* 250 Conn. at 348 (internal quotation marks omitted).   However, "descriptive language may be relevant." *Id.* (quoting *Petereit v. S.B. Thomas, Inc.,* 853 F.Supp. 55, 60 (D. Conn. 1993)).   "Accordingly, the statutory test [is] whether the parties' conduct, in addition to their words, constitutes an agreement or arrangement." *Id.* at 348–49.

As Plaintiffs conceded at oral argument, although the language of the Distribution Agreement on its own is not dispositive, the parties' express disavowal of a franchise relationship is a relevant consideration that weighs against a finding of a franchise relationship.   However, the Court must also consider the conduct contemplated between the parties in determining whether Plaintiffs have stated a claim under the CFA.   *See Dittman & Greer, Inc. v. Chromalox, Inc.*, No. 3:09cv1147 (CFD), 2009 WL 3254481, at *3 (D. Conn. Oct. 6, 2009) ("While the label used by the parties is relevant to determining whether a franchise exists, it is certainly not dispositive." (citing *Contractors Home Appliance, Inc. v. Clarke Distribution Corp.*, 196 F. Supp. 2d 174, 177 (D. Conn. 2002)).

Although Defendants contend that it is "fundamental in contract law for parties, such as Kinsley here, to be bound to the unambiguous terms of the agreements they freely entered" (Defs.' Mem. Supp. [Doc. # 62-27] at 16), the remedial nature of CFA is expressly intended to limit contractual freedom to a certain extent and to prevent a franchisor from "unfairly exerting economic leverage." *Hartford Elec. Supply Co.*, 250 Conn. at 345. Thus, while not dispositive, this provision cuts against a finding of a franchise relationship.[4]

**B.      Section 42-133e(b)(2): "Substantially Associated" with the Franchisor's Trademark**

Defendants contend that Kinsley was not "substantially associated" with MWM because less than 10% of its revenue was derived from this relationship. While the CFA does not require "that a putative franchisee carry exclusively franchisor-trademarked products, a showing of a 'dependen[ce] on the public's confidence in the franchised product for most or all of [the franchisee's] business is required." *B&E Juices, Inc. v. Energy Brands, Inc.*, No. 3:07cv1321(WIG) (MRK), 2007 WL 3124903, at *13 (D. Conn. Oct. 25, 2007). As the Second Circuit has explained "it is clear that the purpose of the statute was to prevent a franchisor from taking unfair advantage of the relative economic weakness of the franchisee" and "[i]n light of such a purpose, it is apparent that the Act was not intended to cover" "a distribution relationship involving only a minute

---

[4] As Defendants note, KES was not a party to the Distribution Agreement and was not formed as a legal entity until after its execution. The Distribution Agreement precluded assignments without Defendants' consent, which was never provided, and thus KES was not a party to the Distribution Agreement. However, given that whether a franchise relationship exists is determined by the parties' conduct as well as their written agreement, this fact does not preclude finding KES to be a franchisee.

percentage of business." *Grand Light & Supply Co., Inc. v. Honeywell, Inc.*, 771 F.2d 672, 677 (2d Cir. 1985) (no franchise relationship existed where the defendant's products represented less than three percent of the plaintiff's sales).

Courts have thus applied a "most or all" formulation and "have found that a franchise existed only where at least half of the plaintiff's business resulted from its relationship with the defendant." *Echo, Inc. v. Timberland Machines & Irr., Inc.*, 661 F.3d 959, 964 (7th Cir. 2011) (applying Connecticut law) (collecting Connecticut state and federal cases). As the court in *Rudel* explained, this formulation "comports with the statute's legislative history" because of "legislators' concern about individuals' 'life savings' and 'livelihood[s],' and the prospect of their being 'forced into . . . bankruptcy or worse,' presupposes that the people the legislators sought to protect were dependent upon the products of the franchisor for all or most of their business." 68 F. Supp. 2d at 126.

Plaintiffs allege that "a substantial portion of Kinsley's business was dedicated to work being performed under the [Distribution Agreement], and substantially all of KES's revenues were to come from sales and service under the [Distribution Agreement]," were it "not for Defendants' wrongful termination."[5] (Am. Compl. ¶ 29.) As the Court noted in denying Defendants' Motion to Dismiss, Plaintiffs' allegations as to this factor were sparse but sufficient to survive under the plausibility standard of review for Rule 12(b)(6). (April 22, 2013 Tr. [Doc. # 57] at 34–38.) Defendants contend that the limited discovery

---

[5] In *Sorisio v. Lenox, Inc.*, 701 F. Supp. 950, 962 (D. Conn. 1988), the court declined to consider sales that would have occurred but for the termination of the alleged franchise agreement, stating that such an "argument transcends reasonable inference into the clearly speculative." To the extent that Plaintiffs seek to rely on potential sales that would have occurred absent termination, the Court rejects this argument as speculative.

conducted establishes as a matter of law that Plaintiffs do not satisfy the CFA's "substantial association" provision because they have shown only that less than 10% of Kinsley's revenue was derived from its relationship with MWM and have offered no evidence as to KES.[6]  (Reply [Doc. # 70] at 2.)

Plaintiffs do not dispute this sales figure in their opposition or cite any contrary figure, but instead contend that the plain language of the CFA does not impose a 50% requirement and that there is "no litmus test" under the CFA for determining substantial association.  (Pls.' Opp'n [Doc. # 64] at 15–16.)  Although the Connecticut Supreme Court has "not weighed in on whether 50% is a strict cut off," *Echo, Inc.*, 661 F.3d at 964, Plaintiffs have not cited any cases in which a court has found a franchise relationship where a party derived in the vicinity of only 10% of its sales or revenue from the alleged

---

[6] At oral argument, Plaintiffs maintained that KES met the substantial association test, because it derived all of its revenue from MWM.  However, it is unremarkable that KES, "a separate legal entity" created by Kinsley, which "was entirely dedicated to supporting sales of MWM products and services" (Pls.' Opp'n at 4), would derive all of its revenue from MWM given that it was set up by Kinsley exclusively for this purpose.  More significant is the fact that Plaintiffs have not quantified the amount of this revenue and the only record evidence is that it was a "small amount."  (Kinsley Dep. at 14–15.)  There is no evidence that KES maintained a distinct corporate identity from Kinsley, both of which were based at the same location and led by Mr. Kinsley.  (*See id.* at 11–12; Connecticut Secretary of State formation record for KES, Ex. R to Defs.' 56(a)1.)  If KES were deemed to satisfy the substantial association test on this basis, any company could do so by creating a separate legal entity dedicated to a given customer even if the business generated from that company was insignificant.  This would elevate form over economic "reality" and would be inconsistent with the purpose of the CFA to protect companies that are economically dependent on a franchisor.  *See Hartford Elec. Supply Co.*, 250 Conn. at 348, 360.

franchisor and Plaintiffs' counsel confirmed at oral argument that he knew of no cases finding a franchise relationship at less than 50%.[7]

Acknowledging that they "experienced somewhat limited success closing sales of MWM products," Plaintiffs maintain that focusing exclusively on sales figures is inappropriate in this case because "they made substantial investments as part of a long-term strategy in support of MWM products," which Defendants "were aware of and approved" but the agreement was terminated "right before Plaintiffs had an opportunity to recoup their investments and close the substantial number of deals [they] had worked on over the previous 18 months." (Pls.' Opp'n at 20–21.) However, Plaintiffs cite no case in which a court has relied upon investment as opposed to actual sales and revenue to find that a franchise relationship existed.[8]

---

[7] Plaintiffs cite *Dittman & Greer, Inc. v. Chromalox, Inc.*, 2009 U.S. Dist. LEXIS 93839, at *17–19 (D. Conn. Oct. 6, 2009), where the court noted that "the percentages of gross profits and total sales alone are not enough to defeat" a finding of a franchise relationship, although "these findings are nonetheless relevant." However, in *Dittman & Greer*, the plaintiffs derived 42% of their sales and 34% of their gross revenue from the defendant, which the court noted was "significant" but still fell "short of percentages where courts have historically identified franchise relationships" and was "less than adequate to constitute 'substantial association,' when considered in combination with the other factors." *Id.* at *17–19.

[8] On September 19, 2014, after oral argument touched upon the absence of evidentiary support for Plaintiffs' argument regarding their investment in the MWM brand, Plaintiffs moved [Doc. # 78] to file a supplemental declaration quantifying this investment. As discussed *supra*, at note 2, with the consent of the parties, the Court had devised a procedure to allow for limited discovery in order to develop an evidentiary record for adjudicating the threshold issue of the existence of a franchise relationship while limiting the expense incurred by each party. The Court advised the parties that any documents not produced for use during depositions could not be relied upon in this motion. (*See* May 8, 2013 Tr. at 18.) Plaintiffs explain that their failure to submit investment evidence during discovery was because "none of the key franchise cases that

14

While theoretically a party's substantial investment in a distributor relationship could arguably create a form of economic dependency on the continuation of the relationship to recoup the investment, the CFA requires that this dependency take the form of a "substantial associat[ion]" between the franchisee's business and the franchisor's brand name or trademarks, which focuses on customers' perspective, not the franchisee's investment.  Conn. Gen. Stat. § 42-133e(b).  The existence of a franchise relationship is dependent on whether "customers in the trade . . . think of the parties as [having] 'one and the same' identity," *Hartford Elec. Supply Co.*, 250 Conn. at 360, because when "the franchisee is completely dependent on the public's confidence in the franchised product for most or all of his business,  . . . severance of the franchise tie . . . could spell ruination."  *Grand Light & Supply Co.*, 771 F.2d at 677.  A parties' investment in a franchisor's brand—which could occur without a franchisor's input—does not create the kind of economic dependency that is protected by the CFA.

The Second Circuit has noted that if the CFA were interpreted to apply to less vulnerable distributor relationships "the legislative cure would be worse than the illness" and "[r]ather than protecting small business operators from capricious destruction of their livelihoods, the Act would unjustifiably interfere with the normal functioning of the marketplace," which "if extended to its logical conclusion, would lock into the Act's

---

discuss the . . . 'substantially associated' tests . . . discuss quantifying the amount spent by the franchisee.'"  (Pls.' Mot. at 1.)  The absence of case law relying on franchisees' investment indicates, as discussed above, that investment, as opposed to actual sales and revenue, is not recognized as a sufficient basis for finding a franchise relationship.  As a result, Plaintiffs' proffered evidence is not relevant and their Motion [Doc. # 78] is therefore denied.

provisions every manufacturer that wished to offer promotional guidance or materials." *Grand Light & Supply Co*, 771 F.2d at 677.

Rather than relying upon sales or revenue figures, Plaintiffs contend that the Plaintiffs' use of MWM's trademark and the degree to which its business was associated with MWM are sufficient to satisfy the "substantially associated" test.  (Pls.' Opp'n at 17.)  Kinsley contends that this requirement is met because it: (1) appeared at trade shows with booths prominently displaying the MWM trademark; (2) distributed business cards bearing the MWM logo to potential customers; (3) made numerous presentations to potential customers utilizing MWM marketing materials, sometimes jointly with MWM; (4) displayed MWM posters and marketing materials at their headquarters; (5) provided customers with MWM promotional materials, such as hats and pens; and (6) created a designated portion of their website for KES's support of MWM products.  (*Id.* at 18–19.)

Despite Plaintiffs' evidence regarding their use of Defendants' trademarks and logos, "[s]ubstantial association is evident when the distributor employs such extensive use of the manufacturer's name and logo that it appears to be its franchisee."  *Dittman & Greer, Inc.*, 2009 U.S. Dist. LEXIS 93839, at *17–18.   This factor is "considered in combination" with sales and revenue figures, not to the exclusion of such evidence.  *Id.* The extent to which Plaintiffs' business is derived from MWM and their use of MWM's trademarks are both avenues to analyze "how dependent, or associated, the franchisee is on its franchisor and its commercial symbols" and the extent to which "customers in the trade . . . think of the parties as [having] 'one and the same' identity."  *Hartford Elec. Supply Co.*, 250 Conn. at 360.

For example, in *Hartford Electric Supply Company,* the Connecticut Supreme Court found a "substantial association" where the franchisee derived over half of its business from the franchisor and "[f]or fifty years, [had] been recognized as the leading distributor of the defendant's products in Connecticut," causing customers to think of them as one entity. 250 Conn. at 360. Here by contrast, (1) Kinsley derived only a small percentage of revenue from its relationship with MWM, (2) the relationship was short, lasting from 2010 to 2012; (3) Kinsley made limited use of MWM's trademarks and logos and never "branded" its building or service vehicles with the MWM logo; and (4) the majority of Kinsley's sales were derived from another company, Kohler, demonstrating that it did not lack an independent identity from MWM and was not completely dependent on it for its existence. On this record, no fact finder could reasonably find that there was a substantial association between the companies. *See Grand Light & Supply Co.,* 771 F.2d at 677 ("No such dependence existed here. Grand Light derived a scant three percent of its business from Micro Switch products. Termination, although harmful from Grand Light's point of view, was not catastrophic.").

Although the failure to satisfy this requirement is a sufficient basis to grant Defendant's motion, the Court will also consider the third requirement for a franchise relationship.

C.      **Section 42-133e(b)(1): Marketing Plan or System "Prescribed in Substantial Part"**

In order to establish a franchise relationship, Plaintiffs must also show that the parties had an "arrangement in which . . . a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor."  Conn. Gen. Stat. § 42-133e(b)(1).[9]

The Connecticut Supreme Court has identified several factors as relevant to whether a putative franchisor has substantially prescribed a marketing plan for the offering, selling or distributing of goods or services:

> [W]hether the franchisor had control over the hours and days of operation, advertising, lighting, employee uniforms, prices, hiring of staff, sales quotas and management training. . . . We also consider whether the alleged franchisor provided the franchisee with financial support and had the right to audit its books or to inspect its premises. . . . This list is not definitive, and we have recognized that some factors may be applicable only to certain types of businesses, such as retailers.

*Edmands v. CUNO, Inc.*, 277 Conn. 425, 440 (2006).  While the Connecticut Supreme Court has cautioned that "there is no one factor, or single combination of factors, required in order to constitute the control required under § 42-133e(b)(1) . . . [w]hen present to a sufficient degree . . . these factors reflect that the franchisor has deprived the franchisee of the right to exercise independent judgment in conducting its business."  *Id.*

Whether the putative franchisor "possesses power over pricing" is "one of the most significant criteria for determining control."  *Hartford Elec. Supply Co.*, 250 Conn. at

---

[9] There is no dispute that Plaintiffs have satisfied the first part of § 42-133e(b)(1), i.e., that they had "the right to offer, sell or distribute goods or services" of MWM.  *See Edmands v. CUNO, Inc.*, 277 Conn. 425, 439 n.8 (2006).

351.   The record here shows that Defendants did not exercise such control.   The Distribution Agreement provides that "MWM and the Agreement Manager shall not dictate or control the prices at which the Products are sold by [Kinsley] to [its] customers." (Distribution Agreement ¶ 6.) Plaintiffs contend that Defendants "indirectly controlled Plaintiffs' prices since [they] unilaterally set the [wholesale] prices at which [they] sold MWM products to Plaintiffs," which in turn constrained Plaintiffs' discretion to determine the retail prices to charge their customers. (Pls.' Opp'n at 24.) However, MWM did not require Kinsley to sell MWM products to its customers at any particular price and Kinsley remained free to negotiate the retail price with its customers. (Kinsley Dep. at 190–91.)

The Connecticut Supreme Court has expressly rejected the wholesale price control argument advanced by Kinsley, noting that under such logic, "a franchise would be created whenever a manufacturer refused to barter over wholesale prices" and it "is clear that such conduct," i.e., unilaterally setting wholesale prices, "does not constitute the type of control to which the franchise act is directed." *CUNO*, 277 Conn. at 444.

Kinsley further contends that control is demonstrated by the fact that MWM required it to submit a business plan and to meet certain "benchmarks" of sales and revenue which were unilaterally set by MWM. (Pls.' Opp'n at 24–25.) However, the Manual clarifies that:

> [t]he Annual Sales Target for Products and Services shall be jointly fixed by Distribution Partner and Agreement Manager within the scope of their discussions on the Annual Business Plan, by taking into consideration Distribution Partner's sales potential. If Agreement Manager and Distribution Partner cannot agree upon an Annual Sales Target,

> Agreement Manager, acting in good faith, shall be entitled to set the Annual Sales Target for Distribution Partner unilaterally.

(Manual ¶ 2.4.)  However, in *CUNO*, the court explained that the requirement that the plaintiff submit a business plan through a "cooperative" process in which the defendant was involved in "setting targets for new customers and revising projections for existing customers based on the plaintiffs' progress in meeting the prior year's goals" demonstrated that the defendant "exercised some control," but it did not "demonstrate the requisite degree of control" because although "the plaintiffs reasonably may have felt under enormous pressure to meet the sales targets . . . . [t]he defendant did not dictate the means by which the plaintiffs were to achieve the sales objectives."  277 Conn. at 448. Plaintiffs have not shown that this business plan made them unable to exercise independent judgment over their business, a key factor in determining whether the requirements of § 42-133e(b)(1) are satisfied.

Kinsley next contends that MWM exercised control over personnel and day-to-day business operations based on its demand that Kinsley have personnel dedicated exclusively to supporting its products, which resulted in the hiring of Ilker Budak as Vice President of KES; MWM's demand that it hire a specific technician in Ohio to support a preexisting MWM customer; and its requirement that Kinsley personnel undergo training in MWM's products.  (Pls.' Opp'n at 25–26.)  However, the issue is not whether "these provisions show some form of control," but rather whether they "usurp the operator's ability to exercise independent judgment on marketing decisions." *Aurigemma v. Arco Petroleum Products Co.*, 698 F. Supp. 1035, 1040 (D. Conn. 1988).

MWM did not dictate the level of staffing required by Kinsley and Kinsley rejected MWM's proposal for four weeks of training in favor of just two.  That MWM required Kinsley employees to obtain some training before holding themselves out as an "authorized" service provider is not necessarily indicative of a franchise relationship that usurps Kinsley's independent judgment.  *See B&E Juices, Inc.*, 2007 WL 3124903, at *15 ("B&E was able to exercise independent judgment on most aspects of its business.  While Energy clearly provided significant marketing assistance with respect to Energy products, it did not exercise sufficient control over the manner in which B & E conducted its business to render the relationship between the parties a 'franchise,' as that term is defined by statute and as it has been interpreted by the courts. . . Thus, B & E has failed to meet the first prong of the definition of a 'franchise.'").

In sum, the record falls short of showing either the economic dependence, *see Hartford Elec. Supply Co.* 250 Conn. at 360, or deprivation of Kinsley's "right to exercise independent judgment in conducting its business," *CUNO, Inc.*, 277 Conn. at 440, that are the hallmarks of a franchise relationship.

### III.      Conclusion

Defendants' Motion for Judgment on the Pleadings [Doc. # 62] is GRANTED. Plaintiffs' Motion [Doc. # 78] for Leave to File a Supplemental Declaration is DENIED. The Clerk is directed to close this case.


IT IS SO ORDERED.


_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 23rd day of September, 2014.

22